CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Appellant, v. DES MOINES UNION RAILWAY COMPANY.

**Railroads:** CONDEMNATION: RIGHT OF WAY: TITLE: TRUSTS. Successive conveyances of real estate impressed with a trust, when made to parties with notice, will not destroy the trust. Thus where a railway company instituted condemnation proceedings for a right of way against a bankrupt, took possession and thereafter retained the same, and pending an appeal a compromise was effected and the bankruptcy court ordered its office to convey to said railway company but the officer conveyed to a trustee instead, who later died, whereupon his heirs quit claimed to another railway company, which latter company conveyed to the defendant in the instant case: *Held,* that as all of the grantees had full knowledge of the trust the defendant took the title in trust and held the same for the benefit of the condemning railway company and its successors.

**Same:** EVIDENCE. The evidence is held to show that the right of way in question was obtained for the railway company under which plaintiff claims, without regard to who may have furnished the consideration therefor.

**Same:** CONDEMNATION: TITLE. A railroad company having no authority to condemn property for right of way can acquire no right therein by the proceeding; and the construction of a railroad thereon would not make the railroad or the franchise of the company the property of the landowners.

**Same:** RIGHT OF WAY: OWNERSHIP: EVIDENCE. The evidence is reviewed and held to show that the road in question was constructed with funds obtained from an individual, with the understanding that it was the property of the company under which plaintiff claims; and that it is insufficient to show that a transfer of the disputed mile of road to another company was contemplated by a settlement between such individual and the other company, in which it is claimed he was allowed for the construction of the road.

**Same:** TITLE: ESTOPPEL. Where a railway company based its claim to a mile of disputed road, which was constructed for another company, upon a settlement made with the party who furnished the funds for the construction of the road, its consent to a transfer of an interest therein to the other company constituted an estoppel barring its right to claim title thereto, even though held in trust.

**Same:** TITLE: EVIDENCE. Even though the party who furnished the funds for the construction of the railroad was allowed for the cost of the mile in question in a settlement with another company, and even though a terminal company subsequently organized was charged with the construction thereof, the evidence is held to show that the terminal company acquired no title to any portion of the disputed mile.

**Same:** MORTGAGES: FORECLOSURE: PARTIES: CONCLUSIVENESS OF DE-CREE. One claiming adversely to both the mortgagor and mortgagee may not be made a party to the foreclosure of the mortgage in a federal court; but the objection that the complaint is multifarious in this respect must be raised by demurrer, plea or answer, and if the point is not so raised the decree adjudging the lien of the mortgage superior to the rights of the adverse claimant is conclusive. Thus, where a railway company, claiming an interest in the road of another company by virtue of a settlement with the party who financed the construction of the road, was made a party to the foreclosure of a mortgage in the federal court given by the constructing company, by failing to properly raise the objection that it was not a proper party it was bound by the decree of foreclosure.

**Same:** ADVERSE POSSESSION: LIMITATION. ''Exclusive'' adverse possession ripens into title in ten years. Therefore the statute did not run while plaintiff and defendant held joint possession of the property.

**Same:** IMPROVEMENT OF PROPERTY: ESTOPPEL. The fact that defendant may have expended large sums in improving the mile of railroad in question, when done with the knowledge of its officers that it did not own the same and that it was owned by plaintiff or its grantor, did not estop the plaintiff from claiming title thereto, regardless of its knowledge concerning the condition of the title.
EVANS, J., dissenting.

*Appeal from Polk District Court.*—HON. W. H. McHENRY, Judge.

SATURDAY, NOVEMBER 22, 1913.

THE controversy is over about one mile of railway extending from Sixteenth or Farnham street to Twenty-eighth street in the city of Des Moines. The plaintiff alleged that it was entitled thereto as a part of the property and franchise purchased by it of the Des Moines, Northern & Western Railroad Company, and which the latter conveyed to it about May 1, 1899, and a correction deed several years later. The defendant denied that the line in dispute was included in such purchase or deed, alleged ownership thereof, adverse possession, and that plaintiff was now estopped from claiming it. Decree was entered dismissing plaintiff's petition, and quieting title in defendant to each parcel of ground making up the right of way. The plaintiff appeals.—*Reversed.*

*Cook, Hughes & Sutherland,* for appellant.

*Guernsey, Parker & Miller,* for appellee.

LADD, J.—The issues raised by the pleadings involve the franchise, tracks, and right of way now occupied and used by the Des Moines Union Railway Company, and over which the trains of the Chicago, Milwaukee & St. Paul Railroad Company are operated, extending from Sixteenth or Farnham street to Twenty-eighth street in Des Moines.

The recital of some facts is essential to a correct understanding of the controversy. The railway of the Wabash, St. Louis & Pacific Railway Company, which became the Wabash Railroad Company, and will be referred to hereafter as the Wabash Company, extended from St. Louis, Mo., to Albia, in this state, prior to 1880, and in December of that year the Des Moines & St. Louis Railway Company was organized by J. S. Polk, F. M. Hubbell, J. S. Clarkson, and J. S. Runnels to construct and operate or lease a railroad from Albia to Des Moines. It was completed, entering the

city from the east, to the depot between Fourth and Fifth streets, now known as the Union Depot, in the spring of 1883, and leased in perpetuity (practically) to the Wabash Company. The Des Moines, Adel & Western Railroad Company had been incorporated in 1875 to construct a railroad from Des Moines to Waukee and westward to the Missouri river. The persons named above acquired control of this company, and by amending its articles changed its name to Des Moines Northwestern Railway Company. Its line (narrow gauge) extended from Waukee to Panora, and under the new management was built from Panora on to Fonda, which, with the road from Clive to Waukee and the half from Farnham street to Clive, will be referred to hereafter as the Fonda line. Through foreclosure proceedings, a new company known as the Des Moines & Northwestern Railway Company acquired the property in September, 1887. The same persons incorporated the St. Louis, Des Moines & Northern Railway Company in April, 1881, to construct a narrow gauge road from Des Moines to Boone, and this was completed the following year, and will be referred to hereafter as the Boone line. It conveyed to the Des Moines & Northwestern Railway Company all its title and interest in the road from Clive to Waukee and one-half of its road "from the station of Clive to Farnham street in the city of Des Moines." Through foreclosure sale, the Boone line passed to the Des Moines & Northern Railway Company. Early in 1891 action looking to consolidation was taken by the Des Moines & Northwestern Railway Company and the St. Louis, Des Moines & Northern Railway Company, and this was effected in December of that year; said companies organizing the Des Moines, Northern & Western Railway Company, which acquired the property of both corporations. Subsequently, and in 1895, the Des Moines, Northern & Western Railroad Company, organized in that year, acquired the property through foreclosure proceedings, and May 1, 1899, in pursuance of previous negotiations, conveyed to the Chicago, Milwaukee & St. Paul Railway

Company, plaintiff herein, the railroads mentioned, "commencing at a point in the east line of section 7, township 78 N., range 24 W., in the city of Des Moines, Polk county, Iowa, and thence extending in a general northern direction via Clive," etc.  This deed further recited: "It being the intention to convey all the aforesaid road lines with all their appurtenances and incidents as received by the grantor herein directed a deed of conveyance executed and delivered by G. M. Dodge, F. M. Hubbell, and F. C. Hubbell, purchasing committee, on the 8th day of Feb., 1895."

The east line of section 7, referred to, marked the city limits, and is known as Twenty-eighth street, and, upon discovering a discrepancy in the description, as was claimed, the officers of the Des Moines, Northern & Western Railroad Company executed a deed purporting to convey the railroad, etc., from Farnham or Sixteenth street to the east line of section 7 or Twenty-eighth street to the Chicago, Milwaukee & St. Paul Railway Company, and it is this 5,120 feet of right of way and track between Sixteenth or Farnham street and Twenty-eighth street, or an area of one hundred and twenty-nine acres, that is involved in this action, which was begun June 27, 1907.  The accompanying map indicates the location of the several roads and the company constructing the same:

Of course, the last-mentioned deed is of no consequence unless the Des Moines, Northern & Western Railroad Company owned the line of railway between Farnham and Twenty-eighth streets at the time of the first conveyance to plaintiff, and, if it did then own said line, title passed thereby or under the general clause contained in the first deed. See *Wisconsin & Arkansas Lumber Co. v. Cable*, 159 Iowa, 81. The plaintiff contends: (1) That it acquired all the property of the Des Moines, Northern & Western Railroad Company under the first deed, and that this included the disputed property between Farnham street and Twenty-eighth street; (2) that F. M. Hubbell and F. C. Hubbell were president and superintendent respectively of said company, and F. C. Hubbell was president of the defendant, and F. M. Hubbell a director, and that they held a controlling interest in each company, and that F. M. Hubbell, in negotiating the sale of the property of said Des Moines, Northern & Western Railroad Company to plaintiff, through Roswell Miller, its president, knowingly and falsely represented to said Miller that said company's line extended from Twenty-eighth street, when it in fact began at Farnham street, and by such false representations induced the plaintiff to accept the deed from Twenty-eighth street; and, farther, (3) that the railroad was constructed from Farnham street to Clive and from there to Boone as one road, and the franchise was for the entire line, and that it is plaintiff's duty to operate such entire line, and not to allow it to be dismembered. Plaintiff prays that the court ascertain defendant's rights to the road, right of way, and property between Sixteenth street and Twenty-eighth street, enjoin defendant from interfering with the management and operation of the same by this plaintiff, and ascertain the amount expended thereon by defendant, which plaintiff offers to repay, if held liable.

By way of answer, the defendant (1) alleged that it owned the property in controversy; (2) denied omission of any property of the Des Moines, Northern & Western Rail-

road Company from the deed to plaintiff dated May 1, 1899;
(3) admitted that F. M. Hubbell represented to Miller that
the line of road extended from Twenty-eighth street, but de-
nied any misrepresentations; (4) pleaded that plaintiff is
estopped from claiming title to said property by reason of
having leased the same from defendant since the execution of
the deed, and by allowing improvements to be made under a
claim of ownership since that time without objection; and
(5) pleaded adverse possession.

The defendant prayed that the petition be dismissed,
that the answer be treated as a cross-petition, and title to
the property in controversy be quieted in it as against the
claim of plaintiff.

The plaintiff, by way of reply, reiterated the charges
of fraud, pleaded that defendant is estopped from claiming
said right of way, for that, prior to the execution of the
first deed to plaintiff, it had acquired all the mortgage bonds
and stocks of the Des Moines, Northern & Western Railway
Company, and before it was informed that defendant claimed
the disputed line.

The first and main question to be determined is whether
the Des Moines, Northern & Western Railroad Company had
title to the line in dispute at the time of the conveyance to
plaintiff. The latter necessarily plants its claim thereto on
the theory that it became owner through mesne conveyances
from the St. Louis, Des Moines & Northern Railway Company.
On the other hand, the defendant contends that the last-
named company never had or acquired title thereto, that
the property in dispute was purchased with money furnished
by Gen. G. M. Dodge or James F. How, trustee, that defendant
acquired the same by purchase from Dodge and How, trustee,
and their assignees and grantees; the St. Louis, Des Moines
& Northern Railway Company and the Des Moines North-
western Railway participating in the transaction.

Plaintiff readily traced title from its grantor to the St.
Louis, Des Moines & Northern Railway. In the conveyance

to plaintiff, the Des Moines, Northern & Western Railroad Company undertook to convey to it "the aforesaid railroad lines" as received by it under a conveyance from "G. M. Dodge, F. M. Hubbell, and F. C. Hubbell, purchasing committee, on the 8th day of Feb. 1895." Turning to that deed, we find the property conveyed described as "a certain line of railroad extending from Farnham street in the city of Des Moines, Polk county, Iowa, through the counties of Polk, Dallas," etc., and deeded to said purchasing committee "by Geo. F. Henry, commissioner of the United States Circuit Court within and for the Southern District, on the 8th day of February, A. D. 1895," in pursuance of a decree of said court entered December 18, 1894, being described in the deed of said court commissioner as "extending from Farnham street in the city of Des Moines" precisely as in that of the purchasing committee, and also in the same language as contained in the decree of foreclosure and the mortgage by the Des Moines, Northern & Western Railway Company to the Metropolitan Trust Company foreclosed. Moreover, the line of railroad is described in the articles of incorporation of the Des Moines, Northern & Western Railway Company as beginning at Farnham street. The latter company was organized in 1891 by and for the purpose of consolidating the Des Moines & Northwestern Railway Company and the Des Moines & Northern Railway Company, and in the third article of incorporation the general purposes and objects of the corporation are declared, among other things, to be "to complete, extend, improve, maintain, and operate the line of railway heretofore owned and operated by the Des Moines & Northwestern Railway Company, extending from Farnham street in the city of Des Moines, Polk county, Iowa, through the counties of Polk, Dallas, Guthrie, Greene, Calhoun, and Pocahontas, to Fonda in the last-named county," and "the line of railway heretofore owned and operated by the Des Moines & Northern Railway Company, extending from Farnham street in the city of Des Moines, Polk county, Iowa, through

the counties of Polk, Dallas, and Boone, to the city of Boone in said last-named county." The consolidation was effected, and the company organized took over the property of the two companies consolidated.

The Des Moines & Northern Railway Company had acquired the Boone line under deed from Solon Humphreys and J. T. Granger, describing it as "the line of railway and franchise (except the franchise to be a corporation) formerly belonging to the St. Louis, Des Moines & Northern Railway Company, extending from Farnham street in the city of Des Moines," etc. Humphreys and Granger appear to have been a purchasing committee representing the mortgagee and bondholders to whom the court commissioner conveyed the property under similar description upon foreclosure of a mortgage executed by the St. Louis, Des Moines & Northern Railway Company. This company, which had been organized in 1881 for the purpose of owning, constructing, and operating, or constructing and leasing, "from Des Moines in Polk county, Iowa, or a connection therewith, through the county of Boone or county of Story toward the north line of the state of Iowa upon such route as may be deemed advisable for the best interests of the company," in February, 1882, executed a mortgage to the Mercantile Trust Company of St. Louis, describing the railway as "from the western boundary line of the city of Des Moines;" but this was corrected in pursuance of a resolution of its board of directors at which F. M. Hubbell and Dodge were present by the execution of a supplemental mortgage, October 2, 1889, to the same company by including therein "all that portion of its line of railroad lying between Farnham street in the city of Des Moines and the western corporate limits of the city," which was Twenty-eighth street. The company signed this supplemental mortgage by G. M. Dodge, as president, and F. M. Hubbell, as assistant secretary. As corrected, it was foreclosed October 15, 1889, and conveyed under the decree of court to Humphreys and Granger as recited above.

The Des Moines & Northwestern Railway Company, the other company consolidating into the Des Moines, Northern & Western Railway Company, was organized in 1887 to take over the Fonda line by conveyance from Polk & Hubbell, described therein as "a line of railway extending from Farnham street in the city of Des Moines through the counties of Polk, Dallas, Guthrie," etc., "acquired by said Polk & Hubbell under and by virtue of a deed of Geo. F. Henry, commissioner" of the U. S. Circuit Court. The conveyance by this commissioner with like description was in pursuance of a decree entered by said court foreclosing a mortgage executed by the Des Moines Northwestern Railway Company to the Central Trust Company of New York and James Cheney, trustees, "on all its railroad property acquired and to be acquired." This mortgage was made in pursuance of an agreement with the Wabash Company, which was financing the road being constructed, the terms of which need not be recited. The minutes and resolutions of the respective boards of directors correspond with these various instruments, and indicate plainly that the officers of the several companies must have regarded Farnham street as the eastern terminus of the system conveyed to plaintiff. This recital leaves no doubt but that the different companies proceeded on the theory that the section of the road in dispute had belonged to the St. Louis, Des Moines & Northern Railway Company, and that their officers, including the president and secretary of the defendant company, who were officers of some of these, acted under that supposition.

Some of the details of construction and the acquirement of the right of way may throw some additional light on the controversy. The line extending from Albia to Des Moines was not completed to the depot into Des Moines by the Des Moines & St. Louis Railway Company until 1883. The railroad of the St. Louis, Des Moines & Northern Railway Company had been finished in August, 1892, from the depot between Fourth and Fifth streets in Des Moines to Boone

as had the line of the Des Moines Northwestern Railway
Company from Panora to Fonda. The Albia line was stand-
ard gauge, and to enable it to reach the roundhouse near
Twelfth street it laid a third rail from the depot to that
street. Some question is raised as to whether the line of the
St. Louis, Des Moines & Northern Railway company ex-
tended to the depot. The engineer and his assistant both so
testified, and they are confirmed by the old vouchers intro-
duced and other evidence. The record leaves no doubt but
that it was built to or from that point. Materials therefore
were unloaded at Eleventh and Vine streets as a matter of
convenience.

The right of way was acquired for that company. Ex-
tending easterly from Twenty-eighth street, for a distance
of 2,220 feet, it was carved out of land owned by B. F. Allen,
whose estate was in bankruptcy, and of which
Hoyt Sherman was assignee. Condemnation
proceedings were begun and damages assessed
by a sheriff's jury at the instance of the St.

1. RAILROADS:
   condemnation
   of right of
   way: title:
   trusts.

Louis, Des Moines & Northern Railway Company. An appeal
was taken by this company, and while it was pending in
court the assignee in bankruptcy applied to the United States
District Court, showing the condemnation and appeal of the
railway company, and that the railway company had offered
to pay the award, with costs and interest, if the assignee
would deed the right of way, and include therein a wedge-
shaped tract lying between it and the right of way of the
Chicago, Rock Island & Pacific Railway Company. This
wedge-shaped tract was represented to be of little or no
value, and the assignee asked permission to convey as pro-
posed to the railway company, and on hearing, the court
ordered that the assignee "be and he is hereby authorized
to accept the proposition of the St. Louis, Des Moines &
Northern Railway Company as set forth in said petition,
and convey to said railway company the real estate described
by metes and bounds in said petition. Thereupon, December

19, 1893, the assignee executed a deed which, after reciting the condemnation proceedings somewhat in detail, was in words following: "Whereas, the United States District Court, by an order dated November 11, 1882, ordered and directed the undersigned assignee to convey said tract to said railway company for the consideration and subject to the conditions therein named: Now, therefore, in consideration of the payment of twenty-three hundred and seventy-three and thirty-three hundredths dollars by James F. How, trustee, of St. Louis, in the state of Missouri, I, Hoyt Sherman, assignee, de hereby sell and convey to said James F. How, trustee, the following described real estate situated in the county of Polk, Iowa, to wit: [Here follows the same description of land.]" A notation of dismissal was entered on the appearance docket of the state court. How the conveyance came to be made to How instead of the railway company does not appear; but it is manifest from the transaction that whatever title to the easement or strip of land he acquired was in trust for the St. Louis, Des Moines & Northern Railway Company. The condemnation was at its instance, and the conveyance by the assignee ordered to be made to it as the deed recites. Necessarily, then, How took title as trustee for the railway company, which continued in the possession it had taken in 1881. How, as trustee of the Wabash Company, paid the consideration, and February 1, 1899, at defendant's instance, the heirs of How executed a quitclaim deed of the strip of land to the Wabash Company, and in March following that company made a like conveyance to defendant. Undoubtedly through these deeds the legal title has passed to the defendant, but in trust for the St. Louis, Des Moines & Northern Railway Company and its successors. See 28 Am. & Eng. Ency. Law (2d Ed.) 938; 39 Cyc. 270; *Cameron v. Hicks,* 141 N. C. 21 (53 S. E. 728, 7 L. R. A. [N. S.] 407); 1 Perry on Trusts, 341.

The rights of way obtained from Elliott and Goode through lots to the east were conveyed to the Des Moines,

St. Louis & Northern Railway Company; the consideration
to Elliott being paid by the construction

2. SAME: evi-
dence.

company, which 'was reimbursed by General
Dodge. The right of way through the Goode lot, though
taken in the name of the St. Louis, Des Moines & Northern
Railway Company, was paid by the Wabash Company.

The next parcel was acquired from R. G. and Marie S.
Orwig, and conveyed to the St. Louis, Des Moines & Northern
Railway Company. One thousand, three hundred and fifty
dollars appears to have been the consideration. The pur-
chase was made by Polk & Hubbell, and the Orwigs executed
a receipt, $1,125, January 2, 1903, to the St. Louis, Des
Moines & Northern Railway Company for the latter amount.
But it appears that half of $1,125 was paid by the Wabash
Company, which was financing the Des Moines Northwestern
Railway Company, to whom one-half of the road from Farn-
ham street to Clive had been conveyed, and that the St. Louis,
Des Moines & Northern Railway Company and the Wabash
Company each paid a half of the remaining $200, though
this was first billed to the former. To the east of this, J.
C. Savary owned a lot, and the right of way of 1,122 feet
through this was condemned by the Des Moines & St. Louis
Railway Company; the commissioners assessing the damages
at $1,950. An appeal seems to have been taken to the circuit
court, and the matter finally adjusted by the payment of an
additional $1,000 in June, 1881, by the St. Louis, Des Moines
& Northern Railway Company, though Gen. Dodge is credited
with $1,950 in the accounting with the Wabash Company.
The condemnation was prior to the construction of the rail-
road, and thereafter, on June 1, 1882, Savary and wife exe-
cuted a quitclaim deed to the right of way to James F. How,
trustee, and he conveyed it to the defendant company April
28, 1888.

Immediately west of Farnham street the railroad crosses
lots, 8, 7, 6, and 4 in block 49 in the order named, and it
was constructed across these without paying damages, and

in the absence of the consent of the owner. Fred C. Hubbell, trustee, had acquired title to lots 7 and 8, and on February 11, 1891, in consideration of $750, executed a deed conveying a strip of land, twenty-eight feet wide, north of and parallel to and adjoining the Chicago, Rock Island & Pacific Railway Company across the lots named to the Des Moines & Northern and the Des Moines & Northwestern Railway Company, and was paid one-half the consideration by each. As this tends strongly to indicate that the grantor was acting under the supposition that the grantees owned the road from Twenty-eighth street to that point at least, his explanation should be stated. He was asked:

Why did you execute a deed to that twenty-eight-foot strip of land? A. I did that in error; I intended to deed to defendant, and the other strip to the two companies mentioned. The Hubbell family owned quite a large tract east of Sixteenth street. We had in mind to build a shop over there on our own ground, so we thought we would deed that triangular strip to the Boone and Fonda lines, so, if we wanted to do anything, we could build on our own ground. We did not have a very definite plan in our minds. The purpose was that we expected that the two companies or the consolidated company would build tracks on that strip up to the shop. It is about eighteen years ago, and we never carried out our plans, because I became president of the defendant, and things were more satisfactory. Q. If the defendant owned out to Twenty-Eighth street, how did you expect to get any connection with the two companies you have named to the property? A. I do not see that that would make any difference. I did deed it to the defendant; but it was not my intention to do it, so, if I wanted to carry out that plan, it would not be covered by the Des Moines Union track. We would run on the defendant track to that point, and lead off their main line into our private yard. I expected the Fonda and Boone lines to use the main track between Twenty-Eighth street and this triangular piece of ground, and then build its own line up to this shop we had in view. We never carried that out, but did that as a matter of precaution. Q. According to your view, these two companies had no track from Twenty-Eighth street? A. No, sir;

so there would be a mile between the track owned by them and this strip that I had or did intend to convey to them.

The tracks are on lot 4 for a distance of about eighty feet, and the right of way thereto was conveyed to the defendant by the Waterworks Company July 21, 1902. A right of way to the west for a distance of about 740 feet was conveyed by Anna L. Brown and husband to the St. Louis, Des Moines & Northern Railway Company June 27, 1881, for a consideration of $1,200. This money appears to have been paid by the construction company, which was later reimbursed by Gen. Dodge. It is apparent from this recital that the right of way throughout the distance in dispute was obtained for the St. Louis, Des Moines & Northern Railway Company, or its successors, regardless of who may have furnished the consideration.

As the Savary tract was condemned at the instance of a company utterly without authority to condemn a right of way at that place, nothing was acquired thereunder; but title to the strip of land was conveyed by Savary to How, trustee, who later deeded it to defendant. The railway undoubtedly was laid there without authority, as it was on lot 4 and partly on an eighteen-foot strip of land subsequently, in 1895, purchased by the defendant from the Chicago, Rock Island & Pacific Railway Company.

3. SAME: condemnation: title.

Because of having been constructed on the land of this company, that deeded to How, and lot 4, did not render the railroad or franchise their property, but at most indicated that no rights of way through these were subject to condemnation, even though not in the hands of the original owners.

The narrow gauge construction company did the work of constructing the railway, and was paid therefor with

money advanced by Gen. Dodge, and the record leaves no
doubt but that this was done with the distinct
understanding that the railroad being con-
structed was that of the St. Louis, Des Moines
& Northern Railway Company. As early as May 10, 1881,
it was resolved by the board of directors of that company
that it "proceed at once to locate and construct the road from
Des Moines to Boone with a branch to Waukee in Dallas
county." E. C. Kinney had been designated by Gen. G. M.
Dodge, who was to furnish the money, as chief engineer and
superintendent of construction. No books save the records
of the directors' and stockholders' meetings of the railroad
company were kept by it until it began to operate the road
in August, 1882. The road was completed by the construction
company with money advanced by Dodge as the work pro-
gressed, and under the understanding as evidenced by reso-
lutions of the board of directors of the railway company, that
he should be compensated therefor by the issuance of bonds
to the amount of $8,000 per mile, drawing interest at the
rate of 6 per cent., and running thirty years, with the mort-
gage or trust deed securing payment, and $10,000 of pre-
ferred stock per mile. That a contract by the railway com-
pany was entered into with the construction company is
recited in the minutes of the companies; but it was not pro-
duced at the trial. Gen. Dodge, in a legal sense, never became
the owner of the road, but did in this way acquire a large
part of the capital stock of the company owning the road
in preferred stock, and held the bonds issued by it. More-
over, it assumed ownership to Farnham street at least, for,
on January 23, 1882, the board of directors thereof adopted
a resolution directing the president and secretary to "ex-
ecute in behalf of this company a conveyance to the Des
Moines Northwestern Railway Company of all of its right,
title, and interest in and to its branch road from Clive to
Waukee and one-half its road from the station of Clive to
Farnham street in the city of Des Moines, Iowa," and an

4. SAME: right of way: owner-ship: evidence.

agreement for the joint management for this portion of the line, and turned the same over to Gen. Dodge for delivery to the grantee upon payment therefor, which he did in 1888 or 1889. The deed executed purported to convey an undivided one-half of the road from Farnham street to Clive. The board of directors of the railroad company, in accepting the road from the construction company, recited in their minutes that it had been constructed "in accordance with the contract of said company, and that the length of said road from the depot in ·Des Moines was 42.365 miles, and that the length of said road from the western limits of the city of Des Moines to the depot in Boone was 40.565 miles. These data in connection with the operation and maintenance of the road by the St. Louis, Des Moines & Northern Railway Company from Farnham street and the contract of January 2, 1882, hereinafter recited, disposing of the road from that street to the depot, put this matter of construction beyond question.

Gen. Dodge had advanced to the construction company $430,938.55. This was in addition to $61,627.72 received from taxes voted in the several townships through which it passed, the election notices of which designated the terminus as "a connection with the line owned or operated by the Wabash, St. Louis & Pacific Railway Company," and curiously enough stipulated that "said railroad shall never pass under the control of any of the lines constituting which is known as the Chicago Pool or of the Chicago, Milwaukee & St. Paul Railroad Company."

There were expenses incurred for rolling stock in addition to these amounts. The company issued bonds for $303,-000 to Gen. Dodge, and at the stockholders' meeting, January 1, 1889, he appears to have held 3,398 shares of preferred stock, and 1,938 shares of common stock; the construction company having 1,534 shares of the latter and 12 shares outstanding. In issuing the bonds and preferred stock, the number of miles was computed from the city limits, and from this circumstance, together with an accounting between Gen.

Dodge and the Wabash Company, the defendant bases its contention that the St. Louis, Des Moines Railway Company never owned the disputed road, and that the same was paid for by Gen. Dodge, to whom credit was given therefor by the Wabash Company, and paid by the issuance of bonds by the defendant when subsequently organized. This feature of the case may now be taken up.

The Albia line was leased by the Des Moines & St. Louis Railway Company to the Wabash Company, as was also the Fonda line by the Des Moines Northwestern Railway Company. But the lessors had previously entered into an agreement with the St. Louis, Des Moines & Northern Railway Company, Gen. Dodge, and James F. How, trustee, concerning joint terminals east of Farnham street, the terms of which will hereafter appear, and, as the Wabash Company had financed the two companies first mentioned, and furnished rails to be used on the last, it undertook; from an examination of the accounts of the different companies, to ascertain what had been expended for property under said contract, and to adjust its accounts with Gen. Dodge. The assistant auditor of the Wabash Company, in connection with F. M. Hubbell and the engineer, E. C. Kinney, examined the vouchers and accounts of the construction company in 1882, and reported to James F. How, the third vice president of the Wabash Company, that Dodge had spent on account of all property in Des Moines $36,391.39. Much of this consisted of estimates of portions of larger items apportioned to this part of the road. There are a great variety of these, such as are incident to the construction of railroads, as grading, track laying, engineer's salaries, ties, rights of way in different portions of the city, and so on. Included are four miles of rails, though these do not seem to have been charged to Dodge in the accounts of the Wabash Company. The statement contained no intimation as to the part of the road within the city on which the expenses had been incurred except in the purchase of rights of way, one from Savary, and

another from Brown, only in the section of road in dispute. Kinney and Hubbell certified that the statement was a ''correct exhibit of expenditures by G. M. Dodge on account of tracks, structures, and other improvement in the city limits of Des Moines made in connection with the St. Louis, Des Moines & Northwestern Railway,'' and Trumbull, said assistant auditor, certified to his examination and his belief that the same was correct. It seems that this report was recorded in the books of the Wabash Company. These books were not proven under the statute, nor the items verified. Nor was this necessary in order to show what went into the bonds issued by the defendant. But, of course, such a copy furnished no proof of what the expenditures were for or of their accuracy. A like examination as to the cost from Des Moines to Clive was made, and the cost from Clive to Waukee, both ascertained in the same manner. As a result, Dodge was credited by the Wabash Company with the actual expense incurred in the construction of the road as thus ascertained from Clive to Waukee and one-half of that from Des Moines to Clive, and that estimated to have been expended in Des Moines, and, after deducting from the total amount of these his indebtedness for rails estimated beyond the city limits obtained from the Wabash Company, the latter appeared to be indebted to him $7,106.50. Later on, November 10, 1884, another computation was made in which Dodge was allowed by the Wabash Company for the line from Clive to Waukee the average cost per mile of the Boone line and one-half of said average per mile for that from Des Moines to Clive, and this added $86,780 to his credit with that company. But his indebtedness for cost of rails was increased $4,076.44; debits against the St. Louis, Des Moines & Northern Railway Company to the amount of $19,057.79 not appearing whether incurred for construction within city limits were charged to him, leaving, after adjusting interest charges and the allowance of the credit of the St. Louis, Des Moines & Northern of $2,762.18, the sum of $51,106.36, credited to Dodge by the

Wabash Company. The sum of only $36,391.39 on any theory can be said to have been expended by him within the city limits. At the same time a statement was prepared by the assistant auditor showing $357,967.31 to have been expended for right of way and improvements. How $306,865.45 of the cost of a roundhouse came to be paid by the issuance of bonds by the defendant is explained by the correspondence between How and Dodge.

On November 17, 1884, James F. How, who was general agent for the receivers for the Wabash Company, wrote Dodge:

Dear Sir: Your letter of the 13th received. Since then I have received your telegram in reply to mine, agreeing to the settlement of the old account on the basis of the statement I sent you. In regard to your desire that we should charge you no more than 6 per cent. interest on the cost of terminal property in Des Moines, if you insist upon this charge, I suppose we will have to agree to it; that being the legal interest charged in the state of Iowa. We are, however, unable to borrow money at that rate, and do not feel that the 7 per cent. charge is too high. Concerning the settlement of the balance due you by the Wabash Company prior to the appointment of the receivers by giving you credit on our books for that amount of interest in the improvements on the terminal property in Des Moines standing in the name of James F. How, trustee, I have had a talk with Col. Blodgett concerning the matter, and he sees no legal objection to doing this; but the settlement of your balance in this manner would have to be made at your risk in case any question should arise in the future concerning it. With this understanding, I see no objection to making this entry on our books.

In reply to this, on November 20th Gen. Dodge responded:

I am in receipt of yours of the 17th inst. I am willing to take Judge Blodgett's advice upon the question of making a transfer of the balance due me by the Wabash Company prior to the time the receivers took charge. Therefore please have the transfer made, and give me credit on the terminal property

for the balance due me from the Wabash.  Be kind enough to have this credit rated from the time the receivers took charge, so that I will only have to pay interest on the difference between the total amount of my present interest and the total cost.  .  .  .   When you have the accounts all settled up on your books, please notify me here officially, so that I can make the proper entries on my Des Moines Northern books.  I think it is best to base everything upon a rate of interest not to exceed 6 per cent. per annum, because it might create trouble hereafter were we to put this at 7 per cent.

If either Gen. Dodge or James F. How contemplated the transfer of any property in making this accounting, this does not appear from the record. It was merely a settlement between them, evidencing great liberality on the part of the Wabash Company, and the indebtedness of it to Dodge was set over on its books against the terminal property in pursuance of the correspondence quoted.  Dodge must have so considered it, for he had signed the contract of January 2, 1882, limiting the terminal to that east of Farnham street; therein recognizing the road west as a part of the Boone line, had taken part in the transfer of an undivided half of the line from Farnham street to Clive, being the custodian of the deed therefor, which he subsequently delivered, and later helped incorporate the defendant company, defining the western boundary of its property as Farnham street, as president of the St. Louis, Des Moines & Northern Railway Company, joined in the execution of the supplemental mortgage thereon in 1889, not to mention numerous other recognitions of the disputed line thereafter including the conveyance by him and the Hubbells, as purchasing committee, to plaintiff's grantor in 1894 as the property of that company's successors.  Moreover, Gen. Dodge could not as an individual traffic in the property of the St. Louis, Des Moines & Northern Railway Company without its consent.  Were it otherwise, surely Dodge would have been called as a witness to testify concerning the transaction.

The Wabash Company had expressly consented to the

conveyance of one-half of the line from Farnham street to
Clive by the St. Louis, Des Moines & Northern Railway
Company to the Des Moines Northwestern
Railway Company, and, having done so, was
not in a situation to assert title even in trust to the road west
of that street.

5. SAME: title: estoppel.

It must be borne in mind that the Des Moines Union
Railway Company was not then organized. Its articles of
incorporation were not adopted until December 10, 1884,
though the organization of a terminal com-
pany appears to have been contemplated
from the outset, for, on January 2, 1882, the Des Moines
& St. Louis Railway Company, the Des Moines Northwestern
Railway Company, and the St. Louis, Des Moines & Northern
Railway Company, together with G. M. Dodge, James F.
How, and James F. How, trustee, entered into a contract
wherein, after reciting that the several companies were en-
gaged in the construction of railways converging at the city
of Des Moines, and ''various purchases have been made of
real property in the city of Des Moines in the name of James
F. How, individually, and James F. How, trustee, and Gran-
ville M. Dodge, and certain additional property has been
appropriated by the Des Moines & St. Louis Railway Com-
pany, and the construction of buildings and other improve-
ments upon said premises have begun,'' it was ''mutually
agreed by the parties above named that the expenses incurred
by the purchase and improvements above mentioned, and
such other as may be hereafter made, shall be borne in the
proportion of one-half by the Des Moines & St. Louis Railway
Company and one-quarter by each of the other two companies
above named. It is understood that a depot company may
be organized, and may take permanent charge of the property
upon the terms herein set forth, and that said company may
issue and deliver to the companies, parties hereto, its mort-
gage bonds to the amount of their respective portions of the
cost of the said purchases and improvements.''

6. SAME: title: evidence.

Fourth. The title to said property shall be and remain in a trustee to be named by agreement of said companies, but subject to the joint use and occupation of all of said railway companies upon the terms herein described.

Fifth. The individual signers hereto hereby declare said purchases to have been made in their names upon the trusts above referred to, and agree to quitclaim and convey the same to said trustee upon demand and reimbursement.

The sixth article provided that the Des Moines & St. Louis Railway Company should be charged with the police control, superintendency, and maintenance of the property, and that the expense thereof be appropriated between it and the other two companies, respectively, to be determined by the wheelage. The eighth article stipulated for the construction of tracks connecting the terminal grounds with manufactories and other sources of trade, the same to be of both narrow and broad gauge. The ninth article directed that the taxes and assessment should be considered as a part of the maintenance account, and the tenth for extending the facilities of the terminal company to other railway companies desiring to enter the city of Des Moines. The twelfth article was in words following: "It is mutually understood that the ground here to be held in common by the companies, parties hereto, are *all east* of *Farnham street* in the city of Des Moines, and that no grounds west of Farnham street have been acquired under this contract."

The foregoing contract was set out *in extenso* in a preamble to the articles of incorporation which recited that the name of the corporation should be the Des Moines Union Railway Company; that the "nature of the business transacted shall be the construction, ownership, and operation of railways in, around, and about the city of Des Moines, Iowa, including the construction, ownership, and use of depots, freight houses, railway shops, repair shops, stockyards, and whatever else may be useful and convenient for the operation of railways, at the terminal point of Des Moines, Iowa, as well

as the transfer of cars from the line or depot of one railway to another, or from the various manufactories, warehouses, storehouses, or elevators to each other 'or to any of the railways or depots thereof now constructed or to be hereafter constructed in or around said city of Des Moines."

It was recited therein that "all the powers by this company shall be in accordance with the terms and spirit" of the contract referred to. The board of directors, consisting of eight members, four of which were to be named by the Des Moines & St. Louis Railway Company, and two each by the other two railway companies, and other restrictions were contained therein not necessary to be repeated. The board of directors of this company met on the day of its organization, and elected Granville M. Dodge president, and F. M. Hubbell secretary. The latter continued the company's secretary until 1898 at least, and Gen. Dodge continued president until succeeded by F. C. Hubbell, who has held the office since. A meeting of the board of directors held on January 1, 1885, on motion of J. S. Polk, after reciting in the way of preamble that the parties signing the contract heretofore mentioned had personally notified the Terminal Company of their approval of the organization thereof, and "their desire and purpose to transfer" the property referred to in said contract to said company, and that it was desirable for the Terminal Company to "take possession of said property, maintain, control, and operate the same, and that it should procure all necessary conveyances and transfers of the same as soon as practicable, and make provisions for and pay for said property so proposed to be conveyed," resolved: "(1) That this company accepts the transfer and management and operation of said property in the city of Des Moines east of *Farnham street* in said city, heretofore owned and controlled by the Des Moines & St. Louis Railroad, Des Moines Northwestern Railway Company, and the St. Louis, Des Moines & Northern Railway Company, and the several others, parties to said contract, and assumes control hereof

from this date, so far as practicable, and it hereby instructs its president to make such order as may be necessary to render such control and management effective, as provided in said contract." The resolution then directs that the officers of the company negotiate with the several parties to the contract for the transfer to it of the several properties and franchises "provided for in said contract of January 2, 1882."

The issuance of stock was then authorized, and also the execution of bonds. The stockholders of the St. Louis, Des Moines & Northern Railway Company met on the same day, and, among other things, resolved: "(2) Resolved, that the proper officers of this company be. authorized upon the issuance to it of the share of the bonds and stock of said Des Moines Union Railway Company to which it may be entitled under said contract to convey, assign, and transfer to said company all its right, title, and interest, of whatever name and character, in and to the real estate franchises, choses in action, and rights in possession or contingent to all the property in the city of Des Moines east of Farnham street in said city now held, enjoyed, or claimed by either or all of the signatories of said contract of January 2, 1882, or any agent or trustee thereof, purchased, acquired, or held in pursuance of said contract."

On the same day the stockholders of the Des Moines Northwestern Railway Company, after reciting the organization of defendant "to acquire, hold, use, and enjoy the real estate rights and franchises in the city of Des Moines east of Farnham street," directed its proper officers to convey "all title and interest this company may have in the real estate, franchises, and property in the city of Des Moines east of Farnham street, and that proper settlement be made for said property." The stockholders of the Des Moines & St. Louis Railway Company on the same day, by resolution authorizing the proper officers of the company, upon the issuance of its share of bonds and stocks of the Des Moines

Union Railway Company "to convey, assign, and transfer to said company all its right, title, and interest of whatsoever name and character in and to the real estate, branches, franchises, choses in action, and rights in possession or contingent to all the property in the city of Des Moines east of Farnham street now held, enjoyed, or claimed by either or all of the signatories of said contract of January 2, 1882, or any agent or trustee thereof, purchased, acquired, or held in pursuance of said contract.''

A deed was executed to the defendant by the St. Louis, Des Moines & Northern Railway Company November 9, 1887, but not filed until April, 1888, conveying all the property it held in the city east of Farnham street. This deed was made by Gen. Dodge, as president, in behalf of the company. On November 8, 1887, the board of directors of the Des Moines & St. Louis Railway Company requested James F. How, trustee, to transfer to the defendant all property acquired by him with the money of the Wabash Company upon the delivery to him of bonds equaling the amount of money so advanced, with taxes, interest, and upon the receipt of three-fourths of the stock of said company and bonds equaling the amount expended. A request, also, was made of Gen. Dodge, as trustee or individually, to make conveyance of any property held by him, and it was resolved on motion of How that the president and secretary of the company "execute to the Des Moines Union Railroad Company a deed conveying to it all its real estate, rights of way, franchises, roadbed, and other property of said company lying and being in the city of Des Moines east of Farnham street, whether the same was given by grant from the city of Des Moines or by purchase and condemnation.'' How executed such a deed dated December 10, 1887; but it was not filed until in April, 1888. Gen. Dodge executed to defendant a deed for property in his name. The Des Moines & St. Louis Railway Company conveyed a large number of lots in the city of Des Moines, not including any in controversy, and "all other real estate

within the city of Des Moines which is the property of the grantor." This was executed in behalf of the company by Clarkson, as president, and F. M. Hubbell, as secretary. No property west of Farnham street was included in any conveyance to defendant except the right of way acquired from J. C. Savary, which will be referred to later on, conveyed long after this transaction. By appropriate action, the Des Moines Union Railway Company accepted these several transfers, and, having executed a trust deed to the Central Trust Company of New York in November, 1887, "for the purpose of paying for the property aforesaid, aiding the extension and construction of said railway, perfecting the title to said property, and completing all necessary and desirable improvements thereto," and described the property as "commencing at the east end of Market street in Brooks & Co.'s addition to Des Moines, Iowa, and running thence west (on certain streets and alleys named, and across certain streets and alleys), and then westerly to Farnham street," issued bonds to Gen. Dodge and James F. How, trustee, for the purchasing committee of the Wabash Company, in the amounts indicated on the books of that company to be charged against the terminal property. If there was any consideration which passed or was intended by the defendant, or the St. Louis, Des Moines & Northern Railway Company, or either of the other two companies, or How or Dodge should pass, other than the property conveyed, this record does not disclose the fact. For all that appears, the grantors conveyed and the grantee received precisely that for which it issued its bonds and one-fourth of its stock to the St. Louis, Des Moines & Northern Railway Company and three-fourths for the Wabash Company; one-fourth to it being for the Des Moines & North-western Railway Company. Indeed, this seems to be put beyond all question by the resolutions of the several companies, the deeds, and defendant's articles of incorporation and trust deed. Nor is there any doubt that defendant fully under-

stood that it was acquiring no property west of Farnham street.

On May 10, 1889, it entered into an agreement with the two companies operating the Boone and Fonda lines and the Des Moines & St. Louis Railway Company concerning the operation, and stipulating for the use of facilities of the terminal property for a period of thirty years, and therein described itself as organized "for the purpose of owning and operating a line of railway in the said city of Des Moines, Iowa, extending from the eastern boundary line of said city to Farnham street in the western part thereof." Its articles were so amended in 1890 as to eliminate the contract of January 2, 1882, and permit of the unrestrained transfer of its capital stock; but on January 31, 1897, another contract between the Des Moines, Northern & Western Railroad Company, which had succeeded to the Boone and Fonda lines, and the Wabash Company, which had acquired the Albia line, confirmed that of May 10, 1889, and made its terms applicable to these companies. Nor did the defendant, in assuming control of the terminal property, interfere in any manner with the possession or maintenance and operation of the mile of road west of Farnham street by the St. Louis, Des Moines & Northern Railway Company in connection with the remainder of its line of railway precisely as it had done since its completion in 1882. And such mile of railway continued in the possession of, and was operated and maintained by, this company and its successors without objection from the defendant until May 12, 1898, with the possible exception of a distance of two hundred or three hundred feet between Farnham street and a small cement bridge to the west. True, the terminal company's yard limit sign may have been kept six hundred or seven hundred feet west of this bridge for some time, and then at Allen's Bluff farther on, and it undoubtedly used the track frequently for switching purposes; but it never, prior to that time, assumed control of the track, or undertook to maintain it. The road master and the section

foreman of the St. Louis, Des Moines & Northern Company, or those of its successors, were in control up to the date mentioned. Moreover, up to that date the time card of defendant was limited to Farnham street, and until 1898 it reported to the executive council of the state that its western terminus was Farnham street. Prior to 1897 its mileage was given in these reports as two and seven-tenths miles, the distance from the eastern terminus to Farnham street; but in that year it was stated as three and seven-tenths miles, and the rights of way in the several tracts in the disputed mile included. Lots 7 and 8, block 49, of Lyon's addition were reported in 1894 and thereafter. The railroad companies under which plaintiff claims did not report these parcels of ground until 1894, when this was done by the Des Moines, Northern & Western Railway Company and the Des Moines, Northern & Western Railroad Company reported them in 1895 and 1896. As the secretary of the defendant was president of both these companies, and the president of defendant their vice president and general superintendent, it would seem that they must have proceeded advisedly. Again, an action was brought in 1895 by the defendant and the Des Moines, Northern & Western Railway Company against James F. Joy and others, purchasing committee of the Wabash Company, for damages because of property conveyed to it as hereinbefore stated not being clear of incumbrance. It was recited in the petition, which was verified by F. M. Hubbell, secretary of defendant, "that prior to 1885 the Des Moines Northwestern Railway Company had executed a mortgage upon its property, which consisted of a line of railway extending from Farnham street in the city of Des Moines, Iowa, to Fonda in the county of Pocahontas," and farther on refers to the terminal property as lying "between Farnham street in the city of Des Moines upon the west and Twenty-second street in said city of Des Moines upon the east." Moreover, Hubbell testified on the trial of the case of Polk & Hubbell (composed of J. S. Polk and F. M. Hubbell)

having bought the line between Farnham street and Fonda at foreclosure sale, that they took possession thereof, and sold it to the Des Moines & Northwestern Railway Company.

Even if the Wabash Company did acquire some claim or interest in the disputed mile of road by virtue of the accounting with General Dodge, though there is not the slightest evidence that such was the fact or their design, and it consented to the conveyance of an undivided one-half thereof between Farnham street and Clive, this sale to Polk & Hubbell divested that company of at least one-half of such interest or claim. Suit was brought by the Central Trust Company of New York and James Cheney, trustee, to foreclose the mortgage executed by the Des Moines Northwestern Railway Company covering its property described as beginning at Farnham street, begun December 4, 1886, and therein the Wabash Company, together with the receivers, were made parties defendant, and decree was entered foreclosing the mortgage against the entire property, and ordering sale thereof November 11, 1887, and sale made accordingly of its entire line extending from Clive to Fonda and one-half of its line extending from Farnham street to Clive.

7. SAME: mortgages: foreclosure: parties: conclusiveness of decree.

Doubtless the Wabash Company was made a party defendant owing to the contract under which the line of the Des Moines Northwestern Railway Company was built. Without setting this out, it will suffice to say that this contract was between the companies last named and the Narrow Gauge Construction Company, stipulating, among other things, that the construction company cancel all of the indebtedness held by it against the Des Moines Northwestern Railway Company except certain contracts with the construction company, extend said railway thirty miles northwest from Panora, and further as this might be arranged; that the Des Moines Northwestern Railway Company pay the construction company in bonds of the Wabash Railway Company, and execute bonds in like amount to a trustee securing the payment of said bonds;

that it issue one-half its stock to the construction company, and the other one-half to the Wabash Company, to the end that each exercise equal control over the property of said railway company; and that, when completed, the railway be leased in perpetuity to the Wabash Company on terms specified. Such lease was subsequently executed. Under this arrangement, the line of the Des Moines Northwestern was extended to Fonda. This furnished sufficient ground for making the Wabash Company a party to the foreclosure proceedings, and, though title in or claim to the property in controversy adverse to that of the mortgagor was not expressly asserted other than as recited, the manifest object of making it a party was to cut off any interest it might have in the property. The rule obtains in the federal courts that a party claiming adversely to both the mortgagor and the mortgagee may not be made a party to foreclosure proceedings. *Dial v. Reynolds,* 96 U. S. 340 (24 L. Ed. 644); *Peters v. Bowman,* 98 U. S. 56 (25 L. Ed. 91). See *Rathbone v. Hooney,* 58 N. Y. 463. But the point that the complaint is multifarious must be raised by demurrer, plea, or answer, and, where this is not done, the decree adjudging a lien superior to such adverse claim is conclusive. *Hefner v. N. W. Mutual Life Ins. Co.,* 123 U. S. 747 (8 Sup. Ct. 337, 31 L. Ed. 309). The decree, then, foreclosed the mortgage against any interest in the undivided one-half of this mile of road the Wabash Company may have had, and title thereto passed to Polk & Hubbell at the commissioner's sale as hereinbefore recited. As this was prior to the acquirement of or payment for any property by defendant, it could not in any event have become owner through the Wabash Company of the undivided half of the disputed mile of road conveyed to the Des Moines Northwestern Railway Company. It should also be added that either the president or secretary of defendant was an officer of each of the several railway companies mentioned, and acted for them in recognizing Farnham street as the eastern terminus of their lines. And this was true after defendant

had assumed control of the terminal property. Thus F. M. Hubbell was president of the Des Moines & Northwestern Railway Company, and at a stockholders' meeting August 17, 1891, to consider widening the railroad to standard gauge, and consolidation with the Des Moines Northern Railway Company, whose property was described as extending from Farnham street, he held 3,250 shares of stock, F. M. Hubbell & Son, 3,249 shares, and General Dodge, 3,500 shares; only five being owned by other parties. Another meeting was held by these stockholders October 12th of the same year, when resolutions were passed reciting that Dodge, Humphreys, and Hubbell owned all the stock and bonds of the two companies "in various proportions," and that whereas, the first parties are the owners of all the capital stock of the Des Moines & Northern Railway Company, which corporation owns and operates a line of railroad from Farnham street in the city of Des Moines, Iowa, to the city of Boone, Iowa, and whereas, the second party and said G. M. Dodge are the owners of all the capital stock of the Des Moines & Northwestern Railway Company, a corporation which owns and operates a line of railway from Farnham street in the city of Des Moines, Iowa, to Fonda, Iowa, and whereas, the Des Moines & Northwestern Railway Company is the owner and engaged in the operation of a line of standard gauge railway extending from Farnham street in the city of Des Moines, Iowa, to Fonda, Iowa, and whereas, the Des Moines & Northern Railway Company is the owner of a line of standard gauge railway extending from said Farnham street to Boone, Iowa," and an agreement entered into by these men July 1st previous, wherein Humphreys is designated as party of the first part, and Hubbell as party of the second part, also was recited, wherein it was stated that "the first parties are the owners of all the capital stock of the Des Moines & Northern Railway Company, which corporation owns and operates a line of railroad from Farnham street in the city of Des Moines, Iowa, to the city of Boone, Iowa, and whereas, the second party and

said G. M. Dodge are the owners of all the capital stock of the Des Moines & Northwestern Railway Company, a corporation which owns and operates a line of railway from Farnham street in said city of Des Moines to Fonda, Iowa," and it was by them agreed that the consolidated company should become owner of "the entire line now belonging to the Des Moines & Northern Railway Company, extending from Farnham street aforesaid to Boone, Iowa," and "the entire railway line of the Des Moines & Northwestern Railway Company extending from Farnham street aforesaid to Fonda aforesaid."

. If the gauge of the latter company were "widened from Farnham street to Fonda before January 1, 1892," meetings of the stockholders of the two companies were to be held to perfect consolidation.    Under this agreement, General Dodge was to have $741,000 in bonds of the new company, F. M. Hubbell $1,629,000 in bonds and all the stock ($3,100,000) of the new company.    The company organized to take over the property of the two companies was incorporated as the Des Moines Northern & Western Railway Company December 14, 1891, and its "general purposes and objects" were: "(1) To own, complete, extend, improve, maintain, and operate the line of railway heretofore owned and operated by the Des Moines & Northwestern Railway Company, extending from Farnham street in the city of Des Moines, Polk county, Iowa, through the counties of Polk, Dallas, Guthrie, Greene, Calhoun, and Pocahontas, to Fonda in said last-named county;" and the "line of railway heretofore owned and operated by the Des Moines & Northern Railway Company, extending from Farnham street in the city of Des Moines, Polk county, Iowa, through the counties of Polk, Dallas, and Boone, to the city of Boone, in said last-named county."

These articles were signed by the Des Moines & Northwestern Railway Company by F. M. Hubbell, president, and by the Des Moines & Northern Railway by A. B. Cummins, vice president.    The board of directors, including General

Dodge, F. M. Hubbell, and F. C. Hubbell, met on the same day, and elected F. M. Hubbell president, and F. C. Hubbell vice president, and adopted a resolution offered by F. C. Hubbell, reciting that consolidation had been effected, that all property, franchises, etc., of the merging companies had been acquired by this company, and "that the Des Moines, Northern & Western Railway Company, the consolidated corporation, shall duly execute and acknowledge a trust mortgage to the Metropolitan Trust Company of New York, as trustee, which mortgage shall convey under the usual terms and conditions all its railroad extending from Farnham street in the city of Des Moines, county of Polk, and state of Iowa, through the counties of Polk, Dallas, Guthrie, Greene, Calhoun, and Pocahontas, to Fonda in said last named county, and also extending from Farnham street aforesaid over the same line to Clive in said county of Polk, and thence through the counties of Polk, Dallas, and Boone to the city of Boone in said last named county, together with all its real estate necessary for and used in connection with the operation of said lines of railway, its rights of way, roadbed."

Therein the president and secretary were authorized to execute said trust mortgage and bonds, and issue stock, the same to be distributed as follows: Bonds, $1,569,000 to F. M. Hubbell, $655,000 to Dodge and Humphreys, $31,000 to Dodge individually; stock, $2,800,000 to F. M. Hubbell, $1,092,000 to Dodge and Humphreys, $1,100,000 to Dodge—and $60,000 in bonds were issued to F. M. Hubbell for one-fourth of the stock in the Des Moines Union Railroad Company, $55,000 in bonds to Dodge for one-eighth of such stock, and one-half of the stock in a coal company. On the next day the mortgage was executed, reciting the acquirement of the lines of railway "extending from Farnham street in the city of Des Moines," and in the granting clause conveyed "all its lines of railway extending from Farnham street." This mortgage was foreclosed in 1894, and the same description appears in the decree and in the court commissioner's

deed to a purchasing committee composed of Dodge and the two Hubbells executed in March, 1895. During the same month the Des Moines, Northern & Western Railroad Company was organized, and its object as recited in its articles was practically the same as its predecessor's, still describing the lines of railway as "extending from Farnham street in the city of Des Moines." So, too, was a like description employed in the deed of this purchasing committee to the last-named company, which was the grantor of the plaintiff.

Such are the main facts bearing on the ownership of the road between Sixteenth or Farnham street and Twenty-eighth street at the time of the execution of the deed by the Des Moines, Northern & Western Railway Company to the plaintiff. In the light of these, the suggestion that Farnham street was referred to as the terminus of the railways and as the western limit of the terminal property by inadvertence or mistake, and that Twenty-eighth street in reality was such terminus and limit, seems utterly without foundation. True, in issuing preferred stock and bonds to the St. Louis, Des Moines & Northern Railway Company to General Dodge, its officers computed distance from Twenty-eighth street; but that did not transfer its title to this mile of road or its franchise to operate it or yield possession thereof. Nor did the company or General Dodge construe the effect of the settlement otherwise. This record will be searched in vain for any claim to any portion of the road by him. On the contrary, the company for which it was constructed, and of which he was president, took possession of the line from Twenty-eighth street to Farnham street in connection with the remainder of the Boone line, and it and its successors continued in the possession and operation of it until May 12, 1898. But it is said that Dodge was paid for road to Twenty-eighth street in the accounting with the Wabash Company, and the same acquired by it for the terminal company. Suppose he was; he did not have the property to sell. It was constructed for, and was then in the possession of, and being operated

by, the St. Louis, Des Moines & Northern Railway Company, and it not only did not undertake to convey but, in deeding all that it owned east of Farnham street to defendant, inferentially asserted that it was under no obligation to convey any west of that point. But there is nothing in the record indicating that General Dodge undertook to dispose of this mile of road, or that any one undertook to buy it. All that appears is that in such accounting General Dodge was credited by the Wabash Company with certain moneys advanced to the construction company to pay for portions of the right of way condemned by the St. Louis Railway Company, and possibly for grading and the like. If these were erroneously allowed, and, through an understanding between How and Dodge with other debts of the St. Louis, Des Moines & Northern Railway Company, saddled onto the terminal company finally, we are unable to understand how that would change the ownership of the road belonging to the company, especially as most of the right of way, including the portions mentioned, had been acquired through the exercise of the right of eminent domain by this company. Whether compensation may be exacted for the appropriation of the easement on lots not in the name of that company is a question not now for determination. That the other rights of way were acquired for the St. Louis, Des Moines & Northern Railway Company strongly confirms our conclusion that its line at first extended to the depot, and that the numerous instruments treating Farnham street as the terminus of the railway lines and the western boundary of the terminal property correctly define these. Surely General Dodge would not have executed the supplemental mortgage on this particular mile of track as president of the St. Louis, Des Moines & Northern Railway Company on October 2, 1889, or have delivered the deed conveying the undivided half of it to the Des Moines Northwestern Railway Company within two years after receiving the bonds of the Des Moines Union Railway Company in satisfaction of the balance credited to him by the Wabash Com-

pany, if he had undertaken to transfer it to either of the latter companies, or if he had reason to suppose that the St. Louis, Des Moines & Northern Railway Company, of which he was acting as president, had not full right to convey it. Nor can we think that either he or the Hubbells would have participated in the execution of the numerous instruments to which attention has been directed, and especially those relating to the consolidation of the Boone and Fonda lines, wherein the division between the railways and the terminal company is defined as Farnham street, and that conveying the road by them as a purchasing committee in 1895, if this had not been the true boundary line. Moreover, it seems scarcely possible that the St. Louis, Des Moines & Northern Railway Company should have established this line, and that it and those claiming under it should have continued to operate, maintain, and control the disputed section in connection with other portions of the road from 1882 until 1897 or 1898 under a mistake of ownership, and all this time with the knowledge and acquiescence of the alleged true owner. It is demanding too much of human credulity to accept such a claim, even though the defendant's president and secretary both testify to as much. The facts and circumstances overwhelm their assertions, and leave no doubt but that the St. Louis, Des Moines & Northern Railway Company and its successors have all the time owned the road to Farnham street, and that the defendant, through its officers, has at all times been aware of that fact. The evidence is such that it could not well have been otherwise. The change in defendant's attitude is readily attributable to the change of interest. It will be recalled that under the articles of incorporation its capital stock was to be held by the railway companies. In 1890, through amendments to the articles, the contract of January 2, 1882, was eliminated from its articles, and the transfer of shares of stock not interdicted. Through different transactions, F. M. and F. C. Hubbell became owners of five-eighths of the stock of this company in January, 1894,

or 2,500 shares of its capital stock; 1,000 shares belonging to the Des Moines, Northern & Western Railway Company, and 500 shares being retained by the Wabash Company. Shortly thereafter, and in the same year, F. M. Hubbell and F. M. Hubbell & Son, owning 30,000 of the 42,000 shares of capital stock, issued by the Des Moines, Northern & Western Railway Company, and $2,500,000 of a total of $2,770,000 of the first mortgage bonds, began negotiations with the Chicago, Milwaukee & St. Paul Railway Company, which resulted in a traffic arrangement between the two companies, and a contract between the Hubbells and the Chicago, Milwaukee & St. Paul Railway Company and Roswell Miller, trustee, wherein it was agreed that, in consideration of said traffic arrangement: (1) The stock in the Des Moines Company and the bonds secured by a mortgage on its property were not to be increased unless in payment at par of property at its actual cost. (2) The Hubbells were to transfer 16,800 shares of the capital stock of the Des Moines Company by first depositing the same with Roswell Miller, as trustee, and he to deliver to the plaintiff 3,360 shares each year for five years, and, if a new corporation should be organized, and take over the property, then a like proportion of its stock was to be dealt with in the same way. (3) The Hubbells were to sell plaintiff 6,468 shares of said stock for $46,200, if purchased after January 1, 1897, and before the first Monday in April, 1899, or, if a new company were organized, a like proportion of its capital stock. (4) The Hubbells were to procure a reduction of interest on the outstanding bonds to 4 per cent per annum, and, if this were impossible, then to have the mortgage foreclosed, a new company organized, and new bonds issued. (5) The board of directors of the Des Moines Company was to consist of seven members after the next annual election, three of whom were to be nominated by plaintiff and elected. The contract is in the nature of an option to acquire a controlling interest in the Des Moines Company in consideration of the

traffic arrangement, and aside from that the plaintiff parted with nothing in consideration thereof.

Under the traffic arrangement, plaintiff undertook to handle freight originating on the line of the Des Moines Company for 60 per cent. of the carriage charges instead of 75 per cent. thereof, which it and other companies had demanded in place of 50 per cent., which had been exacted until shortly before, though the record fails to connect this reduction in any way with the design of the plaintiff to acquire the property of the Des Moines Company.

The contract for the acquirement of stock recites that the line of the Des Moines Company extended from Des Moines, and the correspondence shows that until the fall of 1898 Miller kept in close touch with the operation and was fully informed concerning the affairs of that company. Aside from receiving the shares of its stock in pursuance of the contract, the plaintiff appears to have acquired no interest therein except the delivery of the stock as agreed until the fall of 1898, when Miller wrote Hubbell: ''Please inform me what are the holdings of bonds of the Des Moines, Northern & Western Road that you control, what are controlled by other parties, and also the number of shares of stock controlled by you that go with your bonds when the bonds are sold. I now expect, if the weather is favorable, to go to Des Moines on Tuesday next, and go from there over your road.''

In pursuance of these inquiries, negotiations were opened, and, as the correspondence discloses, a searching investigation into the affairs of the Des Moines Company conducted, the roadbed examined, as well as the conveyances, decrees, etc. That the defendant was then, and had been since May 12th previous, in possession of the disputed line between Farnham street and Twenty-eighth street, and that its yard sign was at the latter point, is not controverted. The evidence is in conflict whether F. M. Hubbell had previously pointed out Farnham street as the terminus of the road. Whatever may be the fact, it is certain that shortly afterwards the claim was

clearly put forward that the terminus was Twenty-Eighth street, as will appear from the correspondence between F. M. Hubbell and Roswell Miller, president of the plaintiff company, who had been authorized by its board of directors to act for it.

In a letter dated November 22, 1898, Miller wrote Hubbell: "Dear Sir: In the contract between the Des Moines Union Railway Company, Des Moines & St. Louis Railroad Company, Des Moines & Northwestern Railway Company, and St. Louis, Des Moines & Northern Railway Company, you state that the Des Moines Union Railway Company operates a line of railway *extending from the eastern boundary line of said city to Farnham street.* I understand that the Des Moines Union property extends to Twenty-eighth street. How is this?"

In response thereto, Hubbell wrote Miller, November 26, 1898: "I herewith inclose you a copy of the articles of incorporation of the Des Moines Union Railway Company. In regard to the Des Moines Union Railway Company's property, will say it extends across the city of Des Moines as it existed prior to 1890, viz., from the east line of section 2, township 78, range 24, to West Twenty-eighth street, a distance of four miles. The recital in the terminal contract adopted May 10, 1889, is in error."

Again, Miller wrote Hubbell, December 2, 1898: "I understand from Mr. Myers that in many places the terminus of the Des Moines, Northern & Western road is stated as being at Farnham street in Des Moines. How is that? Yours truly, Roswell Miller, President."

And on the same day Miller addressed Myers as follows: "I asked Hubbell about the terminus of the Des Moines, Northern & Western road. He said that its terminus is at Twenty-eighth street, and that the statement that its terminus is at Farnham street was in error. I have now asked him how it happens that this error was committed so many times.

When I first asked him I referred only to the error in one case; but I do not recollect what that was.''

Hubbell responded: ''In regard to the ownership of the road between Farnham street and Twenty-eighth street, there is this to be said: That a part of the right of way was deeded to the St. Louis, Des Moines & Northern Railway Company, and a part of it to the Des Moines Union Railway Company. Another contract stands in the name of James F. How, as trustee for the Des Moines & St. Louis Railroad Company, and certain other rights were acquired by the Des Moines & St. Louis Railroad Company in a contract made with the Chicago, Rock Island & Pacific Railway Company. I will take with me to New York a map of this portion of the road, showing as well as I can about the right of way deeds. As the Des Moines Union Railway Company has title to by far the greater part of the right of way to Twenty-eighth street, it has been understood between the Des Moines Union Railway Company and the Des Moines, Northern & Western Railroad Company that the Des Moines Union property extends to Twenty-eighth street, and the Des Moines, Northern & Western Railroad Company's property commences at that point.''

The understanding between the companies alluded to in this letter was not proven, and the conditions of the title to the various parcels or easements constituting the right of way could hardly justify the dismemberment of the company's franchise and the appropriation of a portion of its road by another company. There is no doubt but that from the time of the first contract with plaintiff the defendant commenced encroaching on the line in dispute, first by moving out its yard limit's sign, and then by assuming the possession and maintenance thereof early in 1898. The Des Moines & Northern Railway Company and its successor were helpless, as the president of defendant was its superintendent, and the secretary of defendant its president. Besides, their interest in it was passing to the plaintiff; but they continued in possession of the major portion of defendant's stock. The

plaintiff had then acquired most of the stock and bonds of the Des Moines, Northern & Western Railway Company, and had the remainder by December 29, 1898, and later its board of directors requested that the Des Moines, Northern & Western Railroad Company be and is hereby requested to sell and convey to this company all its railroad and property, and for this purpose to make, execute, and deliver, through its proper officers, a good and sufficient deed of conveyance, conveying and transferring to this company all its railroad and property of every name and nature, wheresoever situated, and all its rights, franchises, licenses, privileges, and immunities of every kind, howsoever derived, in consideration of the sum of $1, and of the cancellation and surrender by this company of all the above-mentioned mortgage bonds of the Des Moines, Northern & Western Railroad Company, amounting in the aggregate to the sum of $2,933,000, with interest due thereon, and of the payment of all other lawful debts of said company.

This request was accepted by the board of directors of the Des Moines Company, and the president and secretary directed ''to make and execute a proper deed of conveyance, under the seal of this company, conveying to the Chicago, Milwaukee & St. Paul Railway Company, its successors and assigns, all the railroad and property of this company of every name and nature, wheresoever situated, and all its rights, franchises, licenses, privileges, and immunities of every kind, howsoever derived, in consideration of the sum of one dollar, and of the cancellation and surrender by the said Chicago, Milwaukee & St. Paul Railway Company of all the mortgage bonds of this company now outstanding, amounting in the aggregate to the sum of $2,933,000, with the interest due thereon, and of the payment of all other debts of this company.''

This was ratified by the stockholders unanimously, and the form of the deed approved, ''conveying to the Chicago, Milwaukee & St. Paul Railway Company, its successors and assigns, all the railroad and property of this company of every

name and nature, wheresoever situated, and all the rights, franchises, licenses, privileges, and immunities of every kind, howsoever derived, as in said deed particularly set forth.''

The deed contained the recitations heretofore stated, and clearly indicated the purpose of the grantor to convey all its railroads and other property. The record leaves no doubt but that the plaintiff relied on the suggestion that the mile of road did not belong to Des Moines, Northern & Western Railway Company, and that for this reason the specific description of the disputed line from Farnham to Twenty-eighth street was omitted from the deed. There could have been no other reason for omitting it, for plaintiff had acquired all the stock and bonds issued by the granting company by which the disputed line was owned, and through its directors and officers could as well have included the same in the conveyance. The plaintiff did not purchase the railroad and other property of the Des Moines, Northern & Western Railroad Company save by surrendering its bonds upon the execution of the deed, but acquired the company itself through the purchase of all its stock.

Though plaintiff had made use of information its officers had acquired, it may well be doubted whether, in relying solely on the suggestions made in the letters to Miller, it exercised the degree of vigilance and caution which might be expected in a transaction of such magnitude; but, as plaintiff was in full control of the granting company, there is no room to doubt that specific description of the disputed mile of track was omitted from the deed in the erroneous belief that it belonged to defendant rather than the plaintiff's grantor. The evidence is equally conclusive that plaintiff acted in this belief until its attorney, J. C. Cook, ascertained, while investigating other matters, that its grantor's line of railway began at Farnham street instead of Twenty-eighth street. It may be that plaintiff in the exercise of reasonable vigilance and diligence, should have learned the ownership of the line in controversy before; but, if so, this can be of no service to the defend-

ant. While it cannot be said to have misled plaintiff, as Hubbell, in writing the letters to Miller, does not appear to have spoken for it, at least, ostensibly, yet, through its officers, as we have pointed out, defendant was fully aware thereof, and that the St. Louis, Des Moines & Northern Railway Company and its predecessors, especially the Des Moines, Northern & Western Railroad Company, did own it. This being so, the pleas of adverse possession and estoppel are readily disposed of.

Though defendant had made some use of the tracks between Farnham street and Twenty-eighth prior to May 12, 1898, such possession was not exclusive, for the Des Moines, Northern & Western Railroad Company and its predecessors operated its trains over the same, and were in possession thereof for the purpose of maintaining and keeping in repair the roadbed and track, during the fifteen years previous. The defendant, then, had been in the exclusive occupancy since that date only for eight years, one month, and thirteen days, and, as the period in which adverse possession may ripen into title is ten years, the plea necessarily fails.

8. Same: adverse possession: limitations.

The evidence to sustain the plea of estoppel tended to show that, with the knowledge of plaintiff and its grantor, defendant expended large sums of money in grading, laying side tracks, and in maintaining the road. These expenses, however, were incurred with knowledge on the part of the officers of defendant that it did not own the road, and that it was in reality the property of plaintiff or of its grantor, and, this being so, it could not have been misled to its prejudice by the acquiescence of plaintiff in what was being done, to say nothing of plaintiff's ignorance concerning its title or that of its grantor. That there can be no estoppel under these circumstances is too elementary to require the citation of authority. The plaintiff, then, acquired the railway between Farnham and Twenty-eighth streets under the original deed or

9. Same: improvement of property: estoppel.

the correction deed of 1907, and has not lost it through laches, estoppel, or adverse possession since.

We do not pretend to have marshaled all the facts contained in this voluminous and complicated record in this opinion; but, with the aid of arguments leaving nothing in point of learning and sagacity to be desired, enough has been recited to exclude all doubt as to the conclusions of fact essential to the decision. Were we able to concur in the deductions of the dissenting opinion, we should have no hesitancy in rendering a decision such as suggested therein; but, upon a separate examination of the record, we are convinced that the facts are as recited herein, and that upon such facts there is no escape from the conclusion that the defendant is a mere trespasser, and that plaintiff is entitled to a decree awarding to it the disputed section of road, and quieting title in it to the different strips of land standing in the name of the St. Louis, Des Moines & Northern Railway Company. As to other strips of land over which the plaintiff's track is laid, and also as to any accounting for moneys expended by either party, the cause is remanded to the district court for such action as may be deemed advisable, not inconsistent herewith. —*Reversed.*

WEAVER, C. J., and DEEMER, GAYNOR, PRESTON, and WITHROW, JJ., concur.

EVANS, J. (dissenting)—I think that the decree of the district court was right, and ought to be affirmed. A dissenting discussion has little purpose to subserve, and I will confine myself to as brief a statement as possible. The printed record before us is prodigious. It contains more than 2,000 pages. Its consideration has imposed great labor upon each member of the court, and especially upon the writer of the majority opinion. To deal with the details of such record would be impracticable, and I shall aim to avoid them, and to state only what seems to me to be the salient facts and

features of the case. Neither party to this controversy has been able to exhibit a technical, legal title to the subject of the litigation. Each party asks for equitable relief. To my mind, the record discloses many equities in favor of the defendant, and none in favor of the plaintiff. The effect of the majority opinion is to disturb a status quo and a possession of property which has been recognized and acquiesced in by all parties in interest for a period of nineteen years prior to the time of the commencement of this suit in 1907. It results, also, in transferring from the defendant to the plaintiff a large property built up by the defendant at its own expense, and worth perhaps hundreds of thousands of dollars, which the plaintiff never supposed that it owned until the defects of defendant's legal title were accidentally discovered by plaintiff's attorney. If it was legally acquired by the plaintiff, it was so acquired without its knowledge, and its value did not enter into its contemplation as determining or influencing any consideration to be paid therefor by the plaintiff. The plaintiff claims as assignee and grantee of the Des Moines, Northern & Western Railroad Company. Such grantor was successor to other companies to which reference will be made later.

The plaintiff first acquired a block of the stock of its grantor in 1894. In 1898 it acquired all the stock and bonds of the grantor company, and caused a formal conveyance to be made by such company to itself of its property. Its claim is that the mile of railroad in dispute was a part of the property of such grantor company.

The history essential to a consideration of the case goes back to about 1881, and involves the affairs of the Wabash Railroad Company. At that time the northern terminal of the Wabash was at Albia. It was proposed by such company to build into Des Moines, and from thence to the northwest. Three subsidiary companies were organized as a part of such plant. One company was organized to build from Albia to Des Moines; a second was organized to build from Des Moines

to Fonda, and to include in its line a small piece of railroad already constructed between Waukee and Panora; a third was organized to build from Des Moines to Boone. These corporations were all financed by the Wabash Company, and were all constructed by the same construction company. The plat set forth in the majority opinion will be an aid to an understanding of the discussion at this point.

It will be noted from the plat that the Boone and Fonda branches came together at Clive. From Clive to Des Moines was a main line stem, which was used in common by both branches, and its cost and maintenance was apportioned equally between the two companies. The individuals who organized the various companies and conducted their transactions were Polk, Hubbell, Clarkson, Runnels, Gen. Dodge, and James F. How; the latter being the representative of the Wabash Company. Gen. Dodge's interest appears to have been confined to the Boone line, and much of its cost was advanced by him in the first instance. It was a part of the plan agreed on by all these parties that a terminal company should ultimately be organized to do the terminal business in the city of Des Moines, and to take over so much of the mileage passing through Des Moines as should be necessary for that purpose. In January, 1882, a written contract was entered into by all the parties to that effect. This contract provided for an apportionment of the stock of the terminal company. Such contract, however, fixed the western limit of the proposed terminal company at Sixteenth street. This would appropriate somewhat less than one mile of the stem between the Des Moines depot and Clive. The terminal company was not in fact organized until December, 1884, and it did not enter into actual operation as a terminal company until 1888. In the meantime the railroad companies had maintained the terminal facilities jointly, apportioning the cost of maintenance. Nearly $400,000 had been expended, and the amount of such expenditure had practically all been advanced by the parent company. The only books kept were kept by the

parent company, and these are in evidence. The subsidiary companies paid for their respective properties only in the sense that the amount expended for such properties was charged against each company respectively by the parent company. The correspondence between the parties and the accounts kept by the parent company show beyond fair dispute that as early as May, 1882, Sixteenth street was abandoned as the prospective western limit of the terminal property. At that time the parent company opened a terminal account, to which was charged all expenditures *within the city limits,* which extended to Twenty-eighth street on the west. The Boone and Fonda lines were charged respectively with the construction of the stem from Clive to Des Moines, being five and thirty-eight hundredths miles to the western limit of the city, which was Twenty-eighth street. Neither of these companies paid or were charged with any part of the cost of construction east of Twenty-eighth street. Property was acquired between Sixteenth and Twenty-eighth streets. Some of it was taken in the name of one company, and some in the name of another, and some in the name of How, trustee; but the consideration therefor was all advanced by the parent company, and charged to such terminal account. When the defendant terminal company was put in operation in the latter part of 1887 and the first part of 1888, its financing consisted of issuing its bonds for the exact amount of the cost of its property plus interest and taxes. The amount of expenditure and cost thus provided for included every item of expense incurred in the acquisition and construction of the line between Sixteenth and Twenty-eighth streets, being the section of the road now in controversy. The terminal company leased to the railway companies the use of its terminal property for a rental based in part upon the interest charges accruing against the company through its outstanding bonds.

The issuance of the bonds of the terminal company for the amount of all expenditures within the city limits was done

in pursuance of certain mutual resolutions between the subsidiary companies on the one hand and the terminal company on the other. These bore date November, 1887. I set forth one of such resolutions as sufficiently illustrative of all.

To the Des Moines Union Railway Company:

This is to notify you that the board of directors of the Des Moines Northwestern Railway Company, at its meeting held in Des Moines, Iowa, November 8, 1887, did pass the following two resolutions, to wit:

No. 1. Whereas, James F. How has, prior to 1881 and since then, purchased certain property, and made expenditures on the same, as trustee for this company, the money expended for said property being furnished by the Wabash, St. Louis & Pacific Railway Company; and whereas, under an agreement between this company and the Wabash, St. Louis & Pacific Company and others, it was intended that said property, standing in the name of James F. How, trustee, should be transferred to the Des Moines Union Railway Company under certain conditions: It is hereby resolved, that James F. How is requested by this company to transfer to the Des Moines Union Railway Company the property referred to above, so purchased, on receiving from said company a stipulation that as soon as practicable after the transfer said Union Railway Company is to deliver to him first mortgage bonds of that company to the amount of the money advanced for the payment of said property and improvements, with interest on same and taxes paid thereon, and also one-half the stock of the Des Moines Union Railway Company, said bonds and stock to be transferred by said How to the purchasing committee of the Wabash, St. Louis & Pacific Railway Company, or their successors or assigns, in lieu for the money advanced by said company to make the purchase of above property and improvements and the payment of taxes for this company.

No. 2. Whereas, Granville M. Dodge has, prior to 1881 and since, purchased certain property and made expenditures on the same, as trustee for this company, the money expended for said property being furnished by said Dodge; and whereas, under an agreement between this company and the Wabash, St. Louis & Pacific Railway Company and others, it was intended that said property, standing in the name of Granville M. Dodge, trustee, and Granville M. Dodge, individually,

should be transferred to the Des Moines Union Railway Company, under certain conditions: It is hereby resolved, that Granville M. Dodge is requested by this company to transfer to the Des Moines Union Railway Company the property referred to above, so purchased, on receiving from said company a stipulation that as soon as practicable said Union Railway Company is to deliver to him first mortgage bonds of that company to the amount of money advanced by him for the payment of said property and improvements, with interest and taxes on the same, and also one-fourth of the capital stock of the Des Moines Union Railway Company.

In response to the resolutions of the three companies, the terminal company adopted the following resolution:

Thereupon it is resolved that, on receipt from the Des Moines & Northwestern Railway Company, and the St. Louis, Des Moines & Northern Railway Company, and the Des Moines & St. Louis Railway Company, and from James F. How, trustee, and G. M. Dodge, of deeds to this company of the property standing in their name in the city of Des Moines, that the officers of this company be authorized to issue to said James F. How and G. M. Dodge, respectively, an agreement to deliver to them, as soon as prepared, bonds for the amount of money, with interest and taxes added, which will be shown by them at that time to have been expended by or through them for or on the property referred to, the agreement for the delivery of bonds to be turned over to James F. How, trustee, to state that the same are for the benefit of the purchasing committee of the Wabash, St. Louis & Pacific Railway Company, also that the agreement issued by the officers of this company shall state that certificates can be prepared, and the officers of the company will issue to the St. Louis, Des Moines & Northern Railway Company certificates for one-fourth of the stock of the company, and to James F. How, trustee, to be delivered to the purchasing committee of the Wabash, St. Louis & Pacific Railway Company, certificates for three-fourths of the stock of the company. Resolved, that the officers of the company, on receipt of deeds referred to in the foregoing resolution, shall place the same on record, and prepare mortgages upon all the property of this company then owned or to be hereafter acquired, to secure not to exceed eight hundred thousand

dollars of bonds, principal and interest payable in gold, to be issued by this company, said bonds to be for one thousand dollars each, dated November 1, 1887, and falling due fifty years from date, and bearing interest at the rate of 5 per cent. per annum, payable semi-annually. Resolved that the officers of this company be authorized, on the execution of said mortgage, to cause to be prepared and executed bonds in conformity with the same, the amount required to be used in payment for the property, as provided in the foregoing resolution.

In pursuance hereof, the terminal company paid, as already indicated, the entire expenditures within the city limits.

From such time forth all the individuals interested in the various companies considered the property of the terminal company as extending west to the then city limits at Twenty-eighth street. All future business was done upon that basis, including the fixing of the rate of rentals to be paid by the different companies. No fraud was possible at this point for two reasons: (1) Because it is not claimed that the property thus taken over had any greater value than its cost; and (2) the subsidiary companies owned the stock of the terminal company in substantially the same proportions as they owned the property which they turned over to it. To put it in another way, before the terminal company was organized and in operation, the property was already in existence and in control of the various companies. The owners of the property organized the terminal company. Such owners had already used the terminal property as such for several years, and their main switch yard, as they used it jointly, had already extended west of Sixteenth street before the terminal company began its operations.

II. The Chicago, Milwaukee & St. Paul Railway Company, the plaintiff and appellant herein, acquired its first interest, if any, in the subject of this litigation in 1894. As an inducement to favorable traffic arrangements, it received as a donation 40 per cent. of the Des Moines & Northwestern

Railroad Company, which represented consolidation of the Boone and Fonda companies hereinbefore referred to. Its business was conducted at that time, and since on its behalf, by its president, Roswell Miller. The Des Moines & Northwestern Railroad Company owned at that time one-fourth of the stock of the terminal company. Roswell Miller learned at that time that the Des Moines & Northwestern Railroad Company only claimed to own its mileage as extending from Twenty-eighth street west, and learned, also, that the terminal company was claiming to own up to Twenty-eighth street. In 1898 the plaintiff acquired all the stock and bonds of the Des Moines & Northwestern Railroad Company, and caused a formal transfer to be made to itself by such company of all its property. From 1894 to 1898 more than twenty letters passed between Miller on the one hand and Hubbell, as representing the terminal company, on the other. Sufficient of these letters are set forth in the majority opinion to show that Miller understood that the terminal company's property extended to Twenty-eighth street. He so wrote distinctly in one of his letters. The letters of Hubbell were explicit on the same point. The deed executed to the plaintiff by the Des Moines & Northwestern Railroad Company was formulated by Miller and his counsel, and it specifically described the line of the granting company as *terminating at Twenty-eighth street.* This was in accord with Miller's understanding since 1894, when he received for his company the first gift of stock. This was his understanding when he acquired for his company the rest of the stock and the bonds of the Des Moines & Northwestern. It was upon this understanding that he agreed upon the consideration to be paid, and upon this understanding he paid such consideration. For nine years thereafter he acquiesced in it before the bringing of this suit. In the meantime large expenses were incurred by the terminal company in the development of its property.

If the claim of the officials of the terminal company to

the property in dispute was in good faith, and if in such good faith they expended large sums of money in the improvement of the property, with the knowledge and acquiescence of the plaintiff, there can be no doubt, I take it, but that the plaintiff would be estopped from maintaining its present suit. This point is disposed of by the majority, with the suggestion that the claim of ownership was in bad faith, because the officials knew that they were without legal title.

This suggestion seems to me somewhat to beg the question. I apprehend that the officials of the defendant company will not be conscious of the knowledge thus imputed to them until the filing of the prevailing opinion herein. This suggestion of bad faith is aided by another suggestion that Roswell Miller, president of the plaintiff company, was wanting in vigilance in failing to discover the extent of his purchase in 1898. It was only necessary for him, in the protection of his company, to limit the purchase price to the dimensions of the property he supposed he was purchasing, and this is exactly what he did. By his purchase he acquired one-fourth of the stock of the terminal company as a part of the property of the granting company.

Whatever defects of method may appear in the making of transfers, I see no room to claim on the record that there was any bad faith on the part of the officials of the terminal company in claiming its property as extending to Twenty-eighth street. It so reported its mileage to the executive council prior to 1898 and ever since. And consistent therewith was the report of the consolidated company, which reported its mileage only as extending from Twenty-eighth street. Since 1898 the plaintiff has operated its trains over the disputed section of road under lease from the terminal company. For ten years prior to 1898 its grantor and its predecessors did likewise. No complaint or claim of fraud was ever made by any party in interest until the beginning of this suit in 1907. I incline to the view that the terminal company has exercised the open, notorious, and exclusive

dominion over the disputed section of the road for more than ten years prior to the beginning of this suit, and that the pleas of limitations and laches are good. But what seems clear to me is that the possession and claim of the defendant company have been without fraud or bad faith, and that the plea of estoppel is well taken.